**PRECISE IMPORTS CORPORATION,**
Mitchell Mogal, Inc., and Topline Industries Corporation, Plaintiffs-Appellants,

v.

Joseph P. KELLY, Collector of Customs of the Port of New York, Irving Fishman, Deputy Collector of Customs, and United States of America, Defendants-Appellees.

No. 348, Docket 30777.

United States Court of Appeals
Second Circuit.

Argued March 7, 1967.

Decided June 15, 1967.

A. Bernard King, New York City (Murray Rosof, New York City, on the brief), for plaintiffs-appellants.

David E. Montgomery, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, and Lawrence W. Schilling and Robert E. Kushner, Asst. U. S. Attys., New York City, on the brief), for defendants-appellees.

Before LUMBARD, Chief Judge, and WATERMAN and SMITH, Circuit Judges.

LUMBARD, Chief Judge.

Plaintiffs brought this action in the Southern District of New York for a declaratory judgment that seven shipments of knives which they imported in early 1962 "and knives similar thereto" were not barred from entry into the United States by the Switchblade Knife Act, 72 Stat. 562 (1958), 15 U.S.C. §§ 1241–44. The knives, except for a few samples, were released to plaintiffs before customs inspection on entry bonds, and were then ordered by the individual defendants, the Collector and Deputy Collector of Customs of the Port of New York, to be redelivered on the ground that they violated the Switchblade Knife Act. Plaintiffs appeal from the dismissal of their complaint after a trial before Judge Croake and a jury, upon the jury's verdict that three knives from the shipments retained as samples by Customs and offered in evidence by the defendants were switchblade knives within the meaning of the act. They also appeal from a judgment for the United States, which was added as a defendant on its own motion, on its counterclaim for liquidated damages under the entry bonds for failure to redeliver the knives, in the amounts of $7,468.80 against plaintiff Precise Imports Corporation, $10,000 against plaintiff Mitchell Mogal, Inc., and $3,810.98 against plaintiff Topline Industries Corporation, plus interest. By stipulation of the parties, this counterclaim was tried before Judge Croake without a jury.

██ Before filing their answer, defendants moved to dismiss the complaint on the ground that 28 U.S.C. § 1583 vests exclusive jurisdiction to review "decisions of any collector of customs * * * excluding any merchandise from entry or delivery, under any provision of the customs laws" in the Customs Court. The motion was denied by Judge Feinberg, 218 F.Supp. 494 (S.D.N.Y. 1963), and defendants have not renewed this contention upon appeal. This court must nevertheless determine whether it has jurisdiction of this case. E. g.,

Mansfield, C. & L. M. Ry. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); Shahmoon Indus., Inc. v. Imperato, 338 F.2d 449 (3 Cir. 1964). We agree with Judge Feinberg that we do have jurisdiction, because the Switchblade Knife Act, which prohibits transportation and distribution of switchblade knives in interstate commerce and their knowing introduction into interstate commerce, 72 Stat. 562 (1958), 15 U.S.C. § 1242, is a criminal statute of general application, not a "provision of the customs laws." Cf. Croton Watch Co., Inc. v. Laughlin, 208 F.2d 93 (2 Cir. 1953). Compare Patchogue-Plymouth Mills Corp. v. Durning, 101 F.2d 41 (2 Cir. 1939). We therefore proceed to the merits of plaintiffs' appeal.

The Switchblade Knife Act defines a switchblade knife as "any knife having a blade which opens automatically—(1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both." 72 Stat. 562 (1958), 15 U.S.C. § 1241(b). At the jury trial of their action for a declaratory judgment and an injunction, plaintiffs read into the record a one-sentence pretrial stipulation of the parties that "the knives involved in this action do not open automatically by button, inertia, gravity, or any combination of the foregoing upon arrival at the Port of New York," and rested. The trial court denied defendants' motion for a directed verdict, and held that defendants had the burden of proving that the knives in issue violated the act.

Defendants then called Joseph Lamb, Assistant Deputy Commissioner for Technical Services in the Bureau of Customs, who testified that he had modified each of three sample knives from plaintiffs' shipments by filing down a rough corner on the heel of the blade and weakening the restraining spring slightly with an icepick, and demonstrated to the jury that the knives as modified

opened with a flick of the wrist. Mr. Lamb stated that he had no special training in working with knives, and had worked from five to nine and one-half minutes on each knife. Defendants also called Louis A. Pinkussohn, an executive with an American manufacturer of knives, who expressed the opinion that the knives in evidence, which had stiletto blades from four and one-half to six and one-half inches long, were designed for use as daggers because their blades were sharp only at the point.

Judge Croake charged the jury, over plaintiffs' objection, that it must find that the knives violated the Switchblade Knife Act, despite the stipulation that they did not open automatically upon entry, if it found that they could be made to open automatically by insignificant alterations *and* that one of the primary utilitarian purposes of their design and construction was for use as weapons. He also charged that in determining whether any alterations needed to make the knives open automatically were insignificant, the jury might consider the extent of the alterations, the time they took, and whether they required any special training or equipment or impaired the general usefulness of the knives. Finally, Judge Croake told the jury that in deciding whether use as weapons was one of the primary purposes of the knives' design, it might consider whether their design suited them primarily for use as weapons, whether they had any use other than as weapons which could not be served as well or better by other forms of knives,[1] whether any characteristics of the knives which increased their suitability as weapons were not required for any other use, and whether any characteristics which made it possible to make the knives open automatically somehow set them apart from other pocket knives not involved in this case. The jury returned a verdict that the knives in evidence were switchblade knives.

1. We are sure that the jury understood this portion of the charge, as we do, as suggesting that it inquire whether any use of the knives other than as weapons could be served as well or better by other knives.

■ We approve Judge Croake's charge, except for the suggestion that the jury consider whether any characteristics which made it possible to alter the knives in evidence to open automatically somehow distinguished them from other pocket knives, the relevance of which is not apparent to us.[2] The report of the Senate Committee on Interstate and Foreign Commerce which recommended passage of the Switchblade Knife Act stated that the enforcement of state laws banning switchblade knives would be extremely difficult as long as such knives could be freely obtained in interstate commerce, and added:

"In supporting enactment of this measure, however, your committee considers that the purpose to be achieved goes beyond merely aiding States in local law enforcement. The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited. This being the case, your committee believes that it is in the national interest that these articles be banned from interstate commerce." S.Rep. No. 1980, 85th Cong., 2d Sess., reprinted in 2 U.S. Code Cong. & Ad. News 1958, at 3435–37.

The congressional purpose of aiding the enforcement of state laws against switchblade knives and of barring them from interstate commerce could be easily frustrated if knives which can be quickly and easily made into switchblade knives, and one of whose primary uses is as

weapons, could be freely shipped in interstate commerce and converted into switchblade knives upon arrival at the state of destination. We decline to construe the act as permitting such facile evasion.

■■ We recognize that penal statutes are to be strictly construed, so as to give fair warning of the acts they prohibit. E. g., McBoyle v. United States, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816 (1931). However, the canon of strict construction does not require that a penal statute be emasculated in disregard of the clear intent of the legislature in enacting it. See, e. g., United States v. Hood, 343 U.S. 148, 72 S.Ct. 568, 96 L.Ed. 846 (1952); United States v. Giles, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937). This is especially true where the statute, although criminal, is first construed in a civil action. Cf., e. g., Johnson v. Southern Pac. Co., 196 U.S. 1, 17–18, 25 S.Ct. 158, 49 L.Ed. 363 (1904). Moreover, the requirement in the charge we have approved that the jury must find that one of the primary purposes of a knife is for use as a weapon not only gives effect to the congressional intent to bar from interstate commerce knives which are well adapted only to use as weapons, but also ensures that the nature of a knife which is found under this standard to violate the act will give fair warning that it is a switchblade knife within the meaning of the act. We hold, therefore, that a knife may be found to be a switchblade knife within the meaning of the Switchblade Knife Act if it is found that it can be made to open automatically by hand pressure, inertia, or gravity after insignificant alterations, and that one of its primary purposes is for use as a weapon.[3]

---

2. Since this suggestion clearly favored plaintiffs, who suggested in their summation that many, if not all, pocket knives can be altered so as to open automatically, we find in it no basis for reversal.

3. The Switchblade Knife Act was given a similar construction in Goldman v. Angle, No. 4815—Civil-J, S.D.Fla., Dec. 12, 1961.

  Analogously, a firearm which lacks a firing pin but which can be fired with a small nail in place of the pin has been

Plaintiffs argue that they should have been granted a declaratory judgment against defendants, notwithstanding the jury's verdict, because defendants did not connect the knives presented in evidence with the shipments in issue, and because there was no proof that the other sample knives retained or the other knives in the shipments were similar to those in evidence. All these contentions assume that defendants had the burden of producing evidence that the knives in the shipments were prohibited by the act. It is not clear that this assumption is correct.[4] But even assuming that defendants bore the burden of production, plaintiffs' contention that it was not met lacks merit. After the three knives were introduced, plaintiffs were asked to stipulate that they came from the shipments in issue. Plaintiffs' counsel replied that two of them, "in their original pre-worked-on condition, and when they were lawful, were imported by the defendant [sic] Mitchell Mogal." He stated that no one in the courtroom could identify the other knife, and it was received on the representation of the Assistant United States Attorney that it could be proved that it came from one of the shipments in issue.

As to the two knives concededly imported by plaintiff Mitchell Mogal, Inc., plaintiffs contend that it was not stipulated that they were imported in one of the shipments in issue. In light of defendants' clear request for a responsive stipulation, however, we cannot accept this strained construction of the response of plaintiffs' counsel.

As to the third knife, and as to plaintiffs' contention that it was not shown that the knives introduced in evidence were representative of those released to them, it is sufficient to observe that plaintiffs did not seek the production of any other sample knives retained by defendants, and that defendants' inability to produce any of the knives released to plaintiffs was due to plaintiffs' own refusal to redeliver them on demand, as required by the entry bonds. In fact, defendants sought at the trial to have plaintiffs directed to produce some of the knives released to them, and plaintiffs' counsel opposed the application, stating that "we haven't got all these knives" and that "I don't even know what knives, if any, can be produced." We think that plaintiffs should have been directed to produce the knives, or to stipulate that the knives in evidence were representative. In any case, plain-

held to be within the National Firearms Act, Int.Rev.Code of 1954, § 5848(1). United States v. Cosey, 244 F.Supp. 100 (E.D.La.1965). Contra, United States v. Thompson, 202 F.Supp. 503 (N.D.Cal. 1962). Compare Model Penal Code § 5.06(2) and Commentary (Ten.Draft No. 13, 1961).

4. The record indicates that defendants intended only to bar entry of the knives into the United States, while permitting their reexport abroad; if so, the burden of persuasion in an action seeking to compel admission of the knives may be upon the importer. It has apparently been assumed that an importer seeking admission of merchandise which has been denied entry on the ground that it infringes a registered trademark, see 60 Stat. 440 (1946), 15 U.S.C. § 1124, has the burden of persuasion. See, e.g., Croton Watch Co., Inc. v. Laughlin, 208 F. 2d 93 (2 Cir. 1953); cf. Richard J. Spitz, Inc. v. Dill, 140 F.Supp. 947 (S.D.N.Y.

1956). It might be contended, however, that such an action is in the nature of an action of replevin, see Wheeldin v. Wheeler, 373 U.S. 647, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (dictum); Slocum v. Mayberry, 15 U.S. (2 Wheat.) 1, 9–13, 4 L.Ed. 169 (1817), and that in a replevin action the collector would have had to justify his retention of the merchandise. Cf. Goldman v. American Dealers Serv., Inc., 135 F.2d 398 (2 Cir. 1943) (dictum).

Even if the burden of persuasion as to the shipments before the court was upon the defendants, it is arguable that in a declaratory judgment action, even one for a declaration of non-liability, the plaintiff should bear the initial burden of producing evidence sufficient to justify a judgment in his favor. See, e.g., Preferred Acc. Ins. Co. v. Grasso, 186 F.2d 987, 991, 23 A.L.R.2d 1234 (2 Cir. 1951) (dictum); Developments in the Law—Declaratory Judgments—1941–1949, 62 Harv.L.Rev. 787, 837 (1949).

tiffs should obviously not be allowed to profit by defendants' inability to produce the knives which had been released to the plaintiffs and which they bound themselves to redeliver and failed to redeliver. If, therefore, the third knife should have been more fully connected, which we do not decide, or the knives released were not shown to be similar to those in evidence, the corresponding portions of plaintiffs' complaint should have been dismissed, and the court's failure to do so certainly did not prejudice plaintiffs. We therefore affirm the dismissal of plaintiffs' complaint upon the jury's verdict.[5]

The judgment for the United States on its counterclaim for liquidated damages under the entry bonds was proper, whether or not the knives were barred by the Switchblade Knife Act. One of the conditions of the entry bonds, which were on Customs Form 7551, was that the importer should

> "redeliver or cause to be redelivered to the order of the collector of customs, on demand by him, in accordance with the law and regulations in effect on the date of the release of said articles, any and all merchandise found not to comply with the law and regulations governing its admission into the commerce of the United States,"

unless a superseding bond had been filed. Plaintiffs failed to return on demand any of the knives released to them under the bonds, and have not disputed the amounts of liquidated damages, fixed by

19 C.F.R. § 25.17(d) as the value of the knives on entry and the estimated duties and taxes on them.

██ Although the language of the bonds is not wholly free of ambiguity, we have concluded that plaintiffs were therefore liable to pay the liquidated damages whether or not defendants' determination that the knives violated the Switchblade Knife Act was finally upheld. Cf. United States v. Dieckerhoff, 202 U.S. 302, 310–312, 26 S.Ct. 604, 50 L.Ed. 1041 (1906); United States v. Daniel F. Young, Inc., 46 F.Supp. 373 (S.D.N.Y.1942), aff'd *per curiam*, 134 F.2d 413 (2 Cir. 1943). The Bureau of Customs is mandated by 46 Stat. 728 (1930), as amended, 19 U.S.C. § 1499, not to release imported merchandise which is required to be inspected before inspecting it "except under * * * bond or other security * * * to assure compliance with all applicable laws, regulations, and instructions * * *." In accordance with this mandate, the clear purpose of the entry bonds is to place Customs, if it demands the return of goods released under the bonds, in as good a position as if it had not released them. Cf. United States v. Huber, 41 C.C.P.A. (Customs) 69, 72–73 (1953). This purpose would be frustrated if plaintiffs were held to be liable under the bonds for failure to redeliver the knives only if the knives were finally held to violate the Switchblade Knife Act.[6]

Affirmed.

5. Plaintiffs contend that Mr. Pinkussohn should not have been allowed to testify, as he was not named in the pretrial order, and that his testimony as to the uses of the knives was irrelevant and inflammatory. But plaintiffs did not seek a continuance to meet Mr. Pinkussohn's testimony, or indicate how they were prejudiced by it. It is clear that his testimony on the uses of the knives was relevant to the issue whether they were switchblade knives.

6. Plaintiffs contend that the counterclaim was based not upon the entry bonds but upon 46 Stat. 734 (1930), 19 U.S.C. § 1514, as it alleged that no timely protest of defendants' demands for liquidated damages had been made and that "the

said amounts are now conclusively due and owing, pursuant to" 19 U.S.C. § 1514. That section, however, creates no cause of action; it merely provides that certain decisions of the Customs shall be final if not protested within sixty days. Moreover, the counterclaim referred specifically to defendants' demands, copies of which were attached as exhibits to plaintiffs' complaint, for liquidated damages under the entry bonds. Thus plaintiffs were apprised of the basis of the counterclaim, as is underscored by the fact that their reply to the counterclaim pleaded as a defense that the sureties on the entry bonds were indispensable parties. (The sureties were notified of the trial of the counterclaim, and stated that they did not wish to appear.)